UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

Gary Alexander,

                              Plaintiff,

                                                          **Hon. Hugh B. Scott**

                                                          03CV799A

                    v.
                                                          **Report
                                                          &
                                                          Recommendation**

Caraustar Mill Group, Inc.,
                              Defendant.

---

 

 

Before the Court is the defendants' motion for summary judgement; as well as the

defendant's motion to strike an affidavit submitted by plaintiff's counsel. (Docket Nos. 26 and

33).

 

 

### Background

The plaintiff, Gary Alexander ("Alexander"), commenced this action alleging that he was

discriminated against because of a disability or a perceived disability by defendant Caraustar Mill

Group, Inc. ("CMG") in violation of the Americans with Disability Act (42 U.S.C. §12101 et

seq.) and the New York State Human Rights Law (§290 of the New York State Executive Law).

Alexander began working for CMG in 1984. In 1989, the plaintiff left CMG for

employment with another company. In 1993, Alexander was re-hired at CMG by Lonnie Helton

1

("Helton"), the plant manager at Cincinnati Paperboard (a CMG affiliate).   According to Alexander, three months after he was rehired by CMG in 1993, he was diagnosed with Multiple Sclerosis ("MS").[1]   The plaintiff asserts that in 1997 he was asked to transfer to CMG's Tennessee location, Chattanooga Paperboard.  In 2000, Alexander transferred back to CMG's Ohio plant, Rittman Paperboard ("Rittman").

In 2001, the plaintiff claims that he had a conversation with CMG Vice President Jerry Lowe while traveling.  In this alleged conversation, Alexander and Lowe discussed the physical manifestations of his MS.   At that time, Lowe is alleged to have said: "You don't know how much longer you can be getting around do you?"  (Docket No. 1 at ¶ 12).  The plaintiff contends that a few weeks later, he and Lowe were discussing the condition of the floor under a paper machine, when Lowe stated: "Well, maybe you're not in condition to get down there to see it." (Docket No. 1 at ¶13).   Subsequent to this incident, Lowe allegedly announced that he wanted to start a committee to compile a list of people at the plant who might be at risk of injury due to their "conditions."  According to Alexander, the intent of gathering the information was to alter the job assignments of individuals based upon their conditions.  The plaintiff asserts that Lowe asked Alexander to be on the committee because he too had a disability. (Docket No. 1 at ¶ 14). Alexander alleges that he stated that he thought it was immoral, if not illegal, to compile the information and wanted no part of it. (Id.).

The plaintiff asserts that approximately eight weeks after refusing to be on the committee he was removed from his position at Rittman by Lowe.  A few hours later, Lowe allegedly

---

[1]  Alexander claims that he subsequently learned that Helton was told by Helton's superior, Paul Nelson, that Alexander should never have been hired in 1993 knowing that he had a disability. (Docket No. 1 at 19).

informed Alexander could stay on at Rittman for special projects.  Alexander claims that six

weeks later he was given the option to transfer to a plant engineer position at Buffalo Paperboard

in Lockport, New York to assist in the closing of that mill.  The plaintiff claims that he was not

offered the standard CMG relocation package as he had with respect to his previous transfers.[2]

Subsequently, Alexander was advised that the mill would remain open. (Docket No. 1 at ¶ 15).

Alexander claims that while he was employed at Buffalo Paperboard he was undermined

on a daily basis by Earl Stecker ("Stecker"), the Buffalo Paperboard plant manager. He claims

that he was given responsibilities previously performed by five individuals and that because of

his disability, keeping up with the responsibilities was "extremely difficult." Alexander claims

that he asked for assistance but was denied.  The plaintiff alleges that Stecker told him that he did

not want Alexander to transfer to the Buffalo mill. (Docket No. 1 at 16-17).

On January 24, 2003, Alexander was terminated from CMG/Buffalo Paperboard but was

told that he could be considered for relocation within GMG elsewhere.  The plaintiff claims that

within two hours he identified a shift foreman position at another GMG mill.  Alexander claims

that Lowe contacted that manager of that mill and advised them not to hire Alexander because he

was "not a good fit." (Docket No. 1 at ¶ 18).

---

[2]  At his deposition, Alexander testified that the only difference in relocation packages was
the fact that package he was given for moving to Buffalo only guaranteed that CMG would purchase
his home for 80% of the appraised value if it did not sell within a specified amount of time.  His
prior relocation packages would ensure that he suffered no financial loss on the sale of his home.
(Docket No. 30, Exhibit A [referred to as the "Alexander Dep."] at pages 87-88).  The plaintiff has
not presented any evidence that other CMG employees were given better relocation packages at that
point in time.  The only evidence in the record suggests that the 80% limitation was included in the
packages given to other CMG employees. (Docket No. 26, Exhibit I at ¶ 8).  In any event, Alexander
acknowledges that because he sold his home to a third party for more than the purchase price, he was
not harmed by the 80% limitation. (Alexander Dep. at pages 90-91).

The defendant contends that Alexander was terminated on January 24, 2003 based upon poor performance.  CMG asserts that the decision to terminate Alexander was made by Stecker, and that at the time Stecker made the decision he was not aware of any health condition of the plaintiff. (Docket No. 26 at ¶ 5).  CMG states that Alexander was transferred to Rittman to work as the production manager on the "Number 3 machine" which manufactured paperboard. (Docket No. 26 at ¶ 8).  However, according to CMG, Rittman was not profitable and experienced $2 million in losses in 2000. (Docket No. 26 at ¶ 9).  Lowe became Rittman's general manager in 2001.  According to Lowe, Alexander's performance as production manager of the Number 3 machine was not satisfactory.  (Docket No. 30, Exhibit B referred to as "Lowe Dep."  at page 30).  Lowe contends that there was friction between Alexander and Tim Hagenbuch ("Hagenbuch"), the next in charge on the Number 3 machine.  Lowe asserts that the plaintiff was frequently tardy or absent from mandatory staff meetings.  (Docket No. 26, Exhibit D [referred to as "Lowe Affidavit"] at ¶ 17).  At this same time, throughout 2001, Rittman continued to lose money according to Lowe.  He decided to reduce the levels of management at both the Number 2 and Number 3 machines. (Lowe Affidavit at ¶ 12).  In March of 2001, Lowe eliminated 16 positions on the Number 2 and Number 3 machines (4 shift foremen; 4 shift leaders, and 8 assistant machine tenders).  In August of 2001, Lowe eliminated a shipping supervisor position as well as Alexander's production manager position. (Lowe Affidavit at ¶¶ 13-15).  Lowe continued to reduce management positions at Rittman in 2002, including the production manager of the Number 2 machine (Tony Menegay), an accountant (Patty Nelson), division finance manager (Matthew Carnwath) as well as individuals in customer service and human resources.

(Lowe Affidavit at ¶¶ 24-26).   In 2003, Lowe shutdown the Number 2 machine completely and eliminated at least six other positions.  (Lowe Affidavit at ¶¶  27- 28).

Lowe contends that he determined to keep Hagenbuch because he was more effective than Alexander. (Lowe Affidavit at ¶ 16).   Although Hagenbuch assumed the duties of the production manager, he was only given the title of machine superintendent.  The move was also made, according to Lowe, to reduce operating expenses inasmuch as Hagenbuch's salary ($80,590) was approximately $12,000 less than Alexander's salary ($92,700). (Lowe Affidavit at ¶ 18).

Lowe maintains that he never told Alexander that he was terminated, and that he did not terminate from employment with CMG. Instead, Lowe asserts that Alexander was asked to work on special projects.  Lowe states that he advised Alexander of an opening in the Buffalo Paperboard plant.  According to Lowe, he would have continued to use Alexander on special projects if Alexander had declined to accept the position in Buffalo.  (Lowe Affidavit at ¶¶ 19- 22).

Lowe denies that he made the comments alleged by Alexander.  (Lowe Dep.  at page 44). Lowe acknowledges that he had a conversation with Alexander while the two were on a business trip to Kentucky, but denies that Alexander informed him of the fact that he suffered from Multiple Sclerosis at that time.  In that conversation, Lowe stated that he had discussed his concerns regarding his (Lowe's) wife who had just had cancer surgery.  According to Lowe, Alexander made some comment about his having a condition, which he did not elaborate on, which might require Alexander to have take  medications and obtain medical treatment from time to time. (Lowe Dep. at page 39).  Lowe denies that he ever had any specific knowledge of the

fact that Lowe suffered from Multiple Sclerosis until after Lowe had been terminated from CMG. (Lowe Dep. at page 44).

Lowe also denies that he ever constituted a committee, as alleged by the plaintiff,  to compile information regarding the "conditions" of CMG employees.  Lowe states that "safety committees" did exist, but that he was not aware that Alexander had quit, resigned or voiced any concern regarding any such committee. Lowe denies ever requesting the compilation of information about the "conditions" of CMG employees. (Lowe Affidavit at ¶¶ 31-33).  Lowe maintains that, if anything, Alexander was treated better than other employees at Rittman, like Menegay, who was not afforded the opportunity to stay on for special projects when their positions were eliminated. (Lowe Affidavit at ¶ 23-25).

Alexander transferred to Buffalo Paperboard in September of  2001.  In 2001, CMG closed two plants in North Carolina, as well as plants in New Jersey and Maryland.  At the time Alexander transferred to Buffalo, it appears that the Buffalo plant was heading for closure as well.  According to Stecker, Alexander's salary was maintained at $92,700 (and eventually raised to $94,600) when he transferred to Buffalo notwithstanding that the plaintiff's salary was "above market" for the position in Buffalo.  (Docket No. 26, Exhibit I [referred to as the "Stecker Affidavit"] at ¶ 5).   Stecker also asserts that Alexander received a comparable relocation

package[3] as other CMG employees; better than the relocation package Stecker himself received

when he transferred to Buffalo. (Stecker Affidavit at ¶ 8).

Stecker states that shortly after Alexander arrived in Buffalo, he began "demonstrating

performance deficiencies that caused literally dozens of important projects to be neglected for

months." (Stecker Affidavit at ¶ 9). According to Stecker, prior to Alexander's arrival at the

Buffalo facility, it was determined that the plant was "overstaffed" and several jobs were

combined or consolidated. In addition, because production was at a low point and the plant was

now only making one type of product, there was no need to hire additional management.

(Stecker Affidavit at ¶¶ 33-34). Stecker states that Alexander voluntarily took on many

responsibilities and worked long hours, but did not work efficiently. (Stecker Affidavit at ¶ 29).

Alexander refused to collaborate with other employees or to delegate his duties, resulting in

missed deadlines. He asserts that the plaintiff also failed to communicate with him to provide

critical information to the testing and production process. (Stecker Affidavit at ¶ 10-12). Stecker

further states that on one occasion, Alexander went on vacation without preparing a "to-do" list

for his employees, resulting in a major disruption of work during the plaintiff's absence.

(Stecker Affidavit at ¶13). On another occasion, Alexander overruled a quality control

assessment and wrongfully released an unacceptable product and defective product. According

to Stecker, when he approached Alexander about this decision, Alexander insisted that the testing

---

[3] The relocation package given to Alexander is attached as Exhibit H to Docket No. 26. The package included lodging, meals and family care for 30 days; cost of moving personal household items to Buffalo; cost of travel to Buffalo; one trip back to former location; home sales assistance including closing costs, attorneys fees, recording fees, inspection fees, title insurance, as well as the company purchase of the plaintiff's old home if it fails to sell. Stecker asserts that the package Stecker received did not include moving expenses. (Stecker Affidavit at ¶ 8).

equipment was faulty.  It turned out that the material was defective and had to be recalled.

(Stecker Affidavit at ¶¶ 16-17).   Stecker also cited the plaintiff's failure to properly or timely

address roof work needed at the Buffalo plant.  On another occasion, Alexander allegedly failed

to arrange for the construction of a wall so that one of the plant buildings could be effectively

heated during winter, resulting in frozen and broken pipes. (Stecker Affidavit at ¶¶ 19- 20).  In

still yet another instance, Alexander purportedly failed to follow company policy to lock-in

vender pricing resulting in the company being billed $3500 instead of $750 as anticipated.

(Stecker Affidavit at ¶ 22).  Stecker further asserts that Alexander was responsible for purchasing

new spools from a vendor, but failed to communicate the specifications properly resulting in the

expenditure of $60,000 to $70,000 on spools that did not match the company's existing

equipment.  (Stecker Affidavit at ¶ 23).

The testimony of Diane LaRuffa ("LaRuffa"),[4] an ex-CMG employee,  provides

additional evidence of Alexander's deficiencies in this respect. LaRuffa, served as an accountant

and office manager for Buffalo Paperboard while Alexander was employed there.   She

corroborates that company policy required that the plaintiff "lock in" prices before authorizing

purchases, and states that Alexander "frequently disregarded" this policy. (Docket No. 26,

Exhibit N [referred to as "LaRuffa's Affidavit] at ¶ 6-8).[5]   LaRuffa states that on several

occasions she reminded Alexander of the policy, but that he was "rude and combative" and

---

[4]   LaRuffa is currently employed as an accountant for Millward Alloys, Inc.

[5]   She specifically corroborates the incidents in which Alexander's failure to follow the policy resulted in CMG being charged $3500 instead of $750; as well as his expenditure of $60,000 to $70,000 on spools that did not work with the company's machines.  (LaRuffa Affidavit at ¶¶ 10-11).

"made no indication that he would comply with the policy." (LaRuffa Affidavit at ¶ 9).

According to LaRuffa, Alexander was often absent from morning meetings and had a

uncooperative attitude; he would frequently make sarcastic comments, and was disrespectful to

Stecker and other employees. (LaRuffa Affidavit at ¶ 12).  On one occasion, she states that she

witnessed Alexander attempt to withhold information from Stecker by instructing other

employees not to tell Stecker about equipment malfunctions or shut-downs. (LaRuffa Affidavit at

¶ 13).  On another occasion, LaRuffa overheard Alexander tell another employee not to tell her

about a machine shut-down "because she will tell Stecker." (LaRuffa Affidavit at ¶ 14).  LaRuffa

states that beginning in the Spring of 2002, she became aware that Alexander was not meeting

company expectations and that she had discussions with Stecker regarding the plaintiff's poor

performance.  She further stated that Stecker often complained to her about Alexander's failure

to complete tasks. (LaRuffa Affidavit at ¶16).  LaRuffa claims that she had no knowledge of any

heath condition suffered by the plaintiff and that she did not discuss the plaintiff's health with

Stecker or anyone else. (LaRuffa Affidavit at ¶ 17-18).

Sheila Reagan ("Reagan"),[6] another former CMG employee who worked at Buffalo

Paperboard during the time Alexander worked there, also provided evidence of the plaintiff's

deficient performance.  Reagan served as the Human Resources and Safety Coordinator at

Buffalo Paperboard.  Her office was located close to Alexander's office and the two had frequent

contact.  According to Reagan, a safety audit revealed that an emergency exit door was not

accessible to employees and violated Occupational Safety and Health Agency ("OSHA")

---

[6]   Reagan no longer works for CMG and is employed as Senior Court Office Assistant for the New York State Unified Court System.  (Reagan Affidavit at ¶ 1).

regulations.  (Docket No. 26, Exhibit L [referred to as the "Reagan Affidavit"] at 4-6).  Reagan

maintains that the Safety Committee instructed Alexander, as the plant engineer, to repair the

emergency exit.  Reagan testifies that Alexander "refused to cooperate with the Safety

Committee and failed to repair the exit door."  Instead, Reagan states, Alexander completely

covered the exit door with siding material making the door totally inaccessible. (Reagan

Affidavit at ¶ 8).  On another occasion, Reagan stated that Alexander failed to attend a mandatory

safety meeting without providing any explanation. (Reagan Affidavit at ¶¶ 10-12). Reagan claims

that on January 18, 2003, Alexander noted that the pulper machine was not operating but refused

to fix it.  He directed Steve Brick to fix the pulper because he was "going fishing."  (Reagan

Affidavit at ¶ 16).  According to Reagan, Brick was not scheduled to work that day and his

mobility was limited because he was on crutches. (Reagan Affidavit at ¶ 17).  Reagan states that

she never discussed Alexander's health with Stecker, or anyone else.  (Reagan Affidavit at ¶ 19).

Stecker states that in April of 2002, he met with Alexander to discuss concerns regarding

the plaintiff's performance.  In addition to Alexander's communication issues and failure to

complete tasks in a timely manner, Stecker discussed the fact that employees were having

difficulty working with the plaintiff and were "afraid of getting yelled at."  (Stecker Affidavit at ¶

25).  Stecker claims that he discussed these problems again with Alexander on several occasions

inasmuch as they were still not resolved. (Stecker Affidavit at ¶ 26). The record includes

documentation of these meetings in the form of Stecker's notes, reflecting a list of performance

issues to be discussed, as well as notes from subsequent meetings.  See Docket No. 26, Exhibit

M.  Stecker also states that he moved Steve Brick to a salaried maintenance supervisor position

to help Alexander with day to day operation, but the plaintiff resisted relinquishing any of his

responsibilities.  In July of 2002, Stecker claims that he also transferred Tommy Bruce from

another CMG facility to assist Alexander with his responsibilities. (Stecker Affidavit at ¶ 36).

On September 5, 2002, Stecker removed Alexander from his "trial leadership" and assigned him

to the "beater room" where he was responsible for just one section of the paper making

operation.   Stecker asserts that in mid-January 2003, he independently determined to terminate

Alexander's employment with CMG.  He states that he had no indication from anyone prior to

the plaintiff's termination that he was in any way disabled.  Stecker claims that he never

observed Alexander walking with a limp or taking medication.  (Stecker Affidavit at ¶ 40).

Alexander was terminated on January 23, 2003.  The Buffalo Paperboard plant was completely

shut down in September of 2003. (Stecker Affidavit at ¶ 42).

Subsequent to his termination from Buffalo Paperboard by Stecker, Alexander learned of

a supervisor's position at CMG's Tama Paperboard facility in Tama, Iowa ("Tama").  Alexander

contacted John Richter ("Richter"), the operations manager at Tama.  The plaintiff had worked

with Richter several years prior at Rittman.  Richter testified that had been aware that Alexander

suffered from Multiple Sclerosis because the plaintiff had told him so.  (Docket No. 30, Exhibit

D [referred to as the Richter Dep.] at page 17).  According to Richter, at least two other

individuals at CMG were aware of Alexander's condition, Darrell Singleton and Mark Maley.

(Richter Dep. at pages 17 and 56 respectively). Alexander never advised Richter that he had

disclosed the fact that he had Multiple Sclerosis to Lowe while on the trip to Kentucky. (Richter

Dep. at page 43).[7]   Alexander never told Richter that he was concerned he was being treated differently by Lowe because of his Multiple Sclerosis.  (Richter Dep. at page 44).

Richter testified that because of the aging workforce at Rittman, CMG wanted to look at the physical demands on the jobs and make sure that the people who were in those jobs could physically perform them.  According to Richter, "it had to do with safety." (Richter Dep. at page 44).  Richter stated that Alexander did express concerns that CMG did not get "into legal trouble if we chose to move somebody or force them into different positions."  Id.  Richter testified that he thought the management at CMG was "sensitive to that."  Id.  Richter stated that the program was a policy, not a committee, and that if they determined that a person had a propensity to get injured, "we would get them extra training, extra counseling." (Richter Dep. at page 45).[8]

According to Richter, Alexander's change in duties at Rittman in the summer of 2001 did not come on as a surprise.

> [T]here were so many changes going on at Rittman.  I figured they were going to clean the whole place out, start over again. I was glad I wasn't over there.  let's put it that way.

---

[7]   Richter stated that there was a standing joke at CMG that if you took a car ride with Lowe, "when you came back, you didn't have a job."  According to Richter, the same thing happened to "several other managers at Rittman." (Richter Dep. at page 43).  Richter did not suggest that this pattern had anything to do with the health of the individuals.

[8]   The plaintiff has not presented any authority supporting the contention that reviewing working conditions and the employees ability to perform their job functions in a safe manner is an improper subject of inquiry for an employer.  The plaintiff's allegations as to CMG's intent are vague, however the plaintiff has presented no evidence whatsoever that CMG took, or planned to take, any improper action in connection with the such a review.  These bald allegations do not support the plaintiff's claims and are insufficient to raise an issue of fact as to the motivation of the decision makers involved in this case.  In any event, these allegations relate to the determination to eliminate the plaintiff's production manager position at Rittman.  As discussed below, the plaintiff does not dispute the defendant's contention that this claim is time barred.

Richter Dep. at page 51.

      Richter could not testify that Lowe or Stecker had any knowledge that Alexander suffered from Multiple Sclerosis. Indeed, Richter testified that after Alexander had been fired, Alexander stated that he was "surprised" that Stecker (and Larry Hartsell, who was with Stecker when Stecker fired Alexander) did ***not*** know he had Multiple Sclerosis.  Speaking of Alexander, Richter stated:

> He was surprised that they didn't know he had MS and that one of the days when they accused him of not being at work he had actually been over at the Cleveland Clinic because of his MS.

Richter Dep.  at page 31.

      Alexander advised Richter that he was interested in the supervisor position even though it would be a significant pay cut because he wanted to keep his medical insurance benefits. (Richter Dep. at page 33).  Richter told Alexander that he would talk to Lowe (Richter's boss) about whether he could hire Alexander for the position at Tama. (Richter Dep. at page 29).

According to Richter:

> Jerry [Lowe] basically said, "you know, I thought you were going to look outside to bring some expertise in."  We were looking for bench strength, which means people who, you know, down the road could take my job.  And because of the problems that he had had with Gary [Alexander] at Rittman and the fact that Earl [Stecker] had had some problems, he didn't see Gary fitting what I had described to him as the job opening, which was to bring bench strength in and expertise, you know, possibly from a competitor. And so he said, "Absolutely not."

Richter Dep. at page 36.

      Ultimately, Amy Smolcich was hired for the supervisor's position.  According to Richter, Smolcich, who has a degree in pulp and paper science from the University of Wisconsin, was the

best candidate and met all of the search criteria, and therefore, was more qualified and a more appropriate fit for the position than Alexander. (Docket No. 26, Exhibit T [referred to as the "Richter Affidavit"] at ¶¶ 5-7).

Three months after his termination from Buffalo Paperboard, Alexander was hired as a production manager for Pekin Paperboard Company in Illinois, a CMG competitor. (Docket No. 30-2 at ¶ 35).

The record also includes the deposition of Scott Cran, who was employed by CMG as a human resources manager and worked at Rittman with Alexander. (Docket No. 30, Exhibit C [referred to as the "Cran Dep."] at page 14).[9]  Cran testified that he considers Alexander to be a friend. (Cran Dep. at page 71). He stated that he was aware that Alexander had Multiple Sclerosis because Alexander had informed him of that fact.  (Cran Dep. at page 25). Cran testified that he never saw any medical records which made reference to Alexander having Multiple Sclerosis (Cran Dep. at page 26). Cran stated that he never noticed Alexander limping; more fatigued than anybody else; Alexander never advised Cran that he needed to rest at work because of his health problems; Cran never had to assist Alexander in turning the ignition of his car; Cran never observed Alexander suffering from any symptom of Multiple Sclerosis of which he was aware; (Cran Dep. at page 27, 47, 67, 68).   Cran never discussed the plaintiff's  health with Helton, Paul Nelson, Tom Dawson, or the nurse at Rittman (Cran Dep. at page 24, 28, 61).  Cran stated that he did have conversations with Barry Smedstad, Mike McMann, and Mark Maley with respect to Alexander's Multiple Sclerosis and his transferring to Rittman in 2000 to assume the production

---

[9]  Cran no longer is employed by CMG.  Cran's position at Rittman was eliminated in 2002 as part of the continued downsizing of Rittman. (Cran Dep. at ¶¶ 11-12).

manager's position.  According to Cran, McMann was concerned about the effects of the demand of the production manager's position on Alexander's health.  (Cran Dep. at pages 48-50, 54-56). Cran, Maley and Smedstad did not have similar concerns. It was decided that if Alexander "wanted to do it, he should be able to do it." (Cran Dep. at page 56).  Cran stated that Lowe was not part of these discussions; that he never spoke with Lowe regarding Alexander's condition, and that he did not think Lowe spoke with McMann regarding it. (Cran Dep. at page 51).

Cran testified that at the time of his transfer to Buffalo, Alexander never presented any records, medical evidence or medical notes or letters from doctors relating to his Multiple Sclerosis. (Cran Dep. at page 30). According to Cran, medical information regarding CMG employees was not kept in the personnel files in the human resources department, but instead were kept in separate medical files which were kept by the CMG nurse. (Cran Dep. at ¶ 18). Cran stated aside from himself and the person keeping the file, employees, including managers would not have access to the records without demonstrating "why it was necessary and [he did not] remember ever going through that." (Cran Dep. at page 31).  He stated that CMG would not have kept a record of time taken off by Alexander when he visited the Cleveland Clinic. (Cran Sep. at pages 69-70).

Cran stated that he never had conversations with Lowe about Alexander having Multiple Sclerosis. (Cran Dep. at page 34).  He did have discussions with Lowe regarding Alexander's performance.  According to Cran, Lowe was "a little critical" of Alexander's performance.  (Cran Dep. at pages 34-35).  Although he always got along with Alexander, Cran testified that "there were people who did not get along well with him." (Cran Dep. at page 72).  According to Cran, Lowe discussed the elimination of Alexander's position with him:

> I would say that he thought and I agree that there was some
> redundancy there.  We had probably too much supervision and we
> wanted to eliminate his position and also a superintendent's
> position rather than the two of them.  And we decided it would be
> the production manager's job that we would eliminate.

Cran Dep. at page 38).  Cran stated that he played a role in the decision, as a "sounding board."

(Id.)  Cran further stated it was his understanding that the elimination of Alexander's production

manager position would not result in Alexander's employment with CMG coming to an end.

According to Cran, he and Lowe had  "[n]ever, never thought of it that way." (Crand Dep. at

page 39).   Cran denied that efforts to find another position for Alexander within CMG were

related to the fact that he had Multiple Sclerosis. (Cran Dep. at page 58). Cran stated that he was

not part of the conversation between Lowe and Alexander when the plaintiff was notified that his

position was being terminated.  However,  Cran testified that he would on occasion travel to a

facility to participate in the termination of an individual's employment depending on the

circumstances and what the manager wanted. (Cran. Sep. at page 64).  Cran testified that if the

individual's employment was ending, he believes he would have been present with the manager

to participate in the termination. (Cran Dep. at page 69).

Cran's understanding of the "at risk" program is consistent with Richter's:

> It was a safety program designed by Jim Szaroletta [Lowe's
> predecessor] that identified the employees who – we call them at
> risk by their repeat offending or repeat appearance on the OSHA
> log.  Meaning, they had recurring injuries.  We looked a the people
> who were on there repeatedly and if they keep doing this, sooner or
> later they're going to have a serious injury and we didn't want that.
> So, we identified the highest offenders or most frequent offenders
> and called that the At Risk program and it is a kind of a retraining
> or re-education of really responsibility and accountability when it
> comes to safety. Trying to push that accountability to the
> employee.

16

Crand Dep. at page 42.  Cran stated that there was no "committee" and he was not aware of

Alexander's concerns regarding the "at risk" program. (Cran Dep. at page 43).  Cran testified that

they did not keep a list of employees' health problems. (Cran Dep. at pages 43-44).

**Standard of Review**

  **Summary Judgment**

  Summary judgment is appropriate where there are no issues of material fact in dispute,

and the moving party is entitled to judgment as a matter of law.  See Trans Sport, Inc. v. Starter

Sportswear, Inc., 964 F. 2d 186, 188 (2nd Cir. 1992) citing Bryant  v. Maffucci, 923 F.2d 979,

982 (2d Cir. 1991).  The court must draw all reasonable inferences in favor of the nonmoving

party and grant summary judgment only if no reasonable trier of fact could find in favor of the

nonmoving party. See Taggart v. Time Inc., 924 F.2d 43, 46 (2d Cir.1991); Howley v. Town of

Stratford, 217 F.3d 141 (2nd Cir. 2000). However, the non-moving party must, "demonstrate to

the court the existence of a genuine issue of material fact." Lendino v. Trans Union Credit

Information, Co., 970 F.2d 1110, 1112 (2nd Cir. 1992), citing Celotex Corp. v. Catrett, 477 U.S.

317, 324 (1986).  A fact is material:

> when its resolution would "affect the outcome of the suit under the
> governing law" and a dispute about a material fact is genuine "if
> the evidence is such that a reasonable jury could return a verdict
> for the non-moving party."

General Electric Company v.  New York State Department of Labor, 936 F.2d 1448, 1452 (2nd

Cir. 1991), quoting Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "The non-

moving party must come forward with enough evidence to support a jury verdict ... and the ... motion will not be defeated merely ... on the basis of conjecture or surmise." Trans Sport, supra, 964 F.2d at 188, quoting Bryant v. Maffucci, supra.  Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." Niagra Mohawk Power Corp. v. Jones Chemical, Inc., 315 F.3d 171, 175 (2d Cir.2003) (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir.1998)). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." Id.; Rochetti v. New York State Dept. of Motor Vehicles,  2005 WL 2340719, *4 (E.D.N.Y.,2005).

 If undisputed material facts are properly placed before the court by the moving party, those facts will be deemed admitted, unless they are properly controverted by the nonmoving party."  Glazer v. Formica Corp., 964 F.2d 149, 154 (2nd Cir. 1992), citing Dusanenko v. Maloney, 726 F.2d 82 (2nd Cir. 1984).  The Court's responsibility in addressing a summary judgment motion is identifying factual issues, not resolving them.  See Burger King Corp. v. Horn & Hardart Co., 893 F.2d 525, 528 (2nd Cir. 1990). However, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Nippon Fire & Marine Ins. Co., Ltd. v. Skyway Freight Systems, Inc., 235 F.3d 53 (2nd Cir. 2000) quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**Shifting Burdens**

      In the context of a summary judgment motion in <u>Cronin v. Aetna Life Ins. Co.</u>, 46 F.3d.

196 (2nd Cir. 1995), the Second Circuit ably discussed the shifting burdens in employment

discrimination cases:

> In general, a plaintiff asserting an employment
> discrimination claim has the burden at the outset of presenting
> evidence sufficient to establish a prima facie case of
> discrimination. ...   Once the plaintiff has adduced evidence
> sufficient to establish a prima facie case, if the employer proffers, "
> 'through the introduction of admissible evidence,' reasons for its
> actions which, *if believed by the trier of fact*, would support a
> finding that unlawful discrimination was not the cause of the
> employment action," ... the presumption of discrimination raised
> by the plaintiff's prima facie showing "drops out of the picture" ... .
> The plaintiff has the "ultimate burden of persuasion" to
> demonstrate that the challenged employment decision was the
> result of intentional discrimination. ...   Though the plaintiff's
> ultimate burden may be carried by the presentation of additional
> evidence showing that "the employer's proffered explanation is
> unworthy of credence," ... it may often be carried by reliance on the
> evidence comprising the prima facie case, without more ... . Thus,
> unless the employer has come forward with evidence of a
> dispositive nondiscriminatory reason as to which there is no
> genuine issue and which no rational trier of fact could reject, the
> conflict between the plaintiff's evidence establishing a prima facie
> case and the employer's evidence of a nondiscriminatory reason
> reflects a question of fact to be resolved by the factfinder after trial.

<u>Cronin</u>, 46 F.3d. at 202-03.

      Courts are particularly cautious about granting summary judgment to an employer in a

discrimination case when the employer's intent is in question. See <u>Gallo v. Prudential Residential</u>

<u>Servs., Ltd. Partnership</u>, 22 F.3d 1219, 1224 (2d Cir.1994);   <u>Meiri v. Dacon</u>, 759 F.2d 989, 998

(2d Cir.1985). Because direct evidence of an employer's discriminatory intent will rarely be

found, "affidavits and depositions must be carefully scrutinized for circumstantial proof which, if

believed, would show discrimination." <u>Gallo</u>, 22 F.3d at 1224.  However, even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment.  See <u>Meiri</u>, 759 F.2d at 998.  See also <u>Schwapp v. Town of Avon</u>, 118 F.3d 106,110 (2nd Cir. 1997).


**ADA & Human Rights Claims** [10]

The Americans with Disabilities Act ("ADA") provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... [the] discharge of employees... ." 42 U.S.C. S 12112(a).  In order to make out a prima facie case of discriminatory discharge under the ADA, a plaintiff must show that (1) his employer is subject to the ADA; (2) he suffers from a disability within the meaning of the ADA; (3) he could perform the essential functions of his job with or without reasonable accommodation; and (4) he was fired or suffered some other adverse job action because of his disability. See <u>Reeves v. Johnson Controls World Services, Inc.</u>, 140 F.3d 144 (2nd Cir.1998); <u>Ryan v. Grae & Rybicki, P.C.</u>, 135 F.3d 867, 869-70 (2d Cir. 1998).

The plaintiff asserts that he has suffered three instances of adverse employment action based upon his disability: (1) the elimination of his position at Rittman; (2) his termination from Buffalo Paperboard; and (3) the failure to offer him the supervisor position at Tama.  Initially, the defendant asserts that the plaintiff cannot maintain a claim regarding the elimination of his

---

[10]  The plaintiff also asserts a claim under the New York State Human Rights Law ("HRL"). The legal standard for a discrimination claim under the HRL are "essentially the same" as those under the ADA and may be analyzed together. <u>Parker v. Columbia Pictures Indus.</u>, 204 F.3d 326, 332 n. 1 (2d Cir.2000); <u>Mohamed v. Marriott Int'l Inc.</u>, 905 F.Supp. 141, 156-57 (S.D.N.Y.1995).

position at Rittman inasmuch as he did not file a claim with the Equal Employment Opportunity

Commission regarding that issue within 300 days, and that any action with respect to that

determination is now time barred.  (Docket No. 27 at page 12).  The plaintiff's papers do not

address this argument and thus, the plaintiff apparently concedes that this claim is time barred.

The defendant argues that the plaintiff cannot establish a *prima facie* case in this case

inasmuch as the plaintiff cannot show that he was terminated because of his alleged disability. [11]

In this regard, the defendant asserts that it is undisputed that Stecker had no knowledge of the

fact that Alexander suffered from Multiple Sclerosis prior to Alexander's termination. In

response to the instant motion, Alexander claims that he discussed his physical condition with

Stecker on more than one occasion and that he had informed Stecker of the fact that he suffered

from Multiple Sclerosis prior to his termination. (Docket No. 30, Affidavit of Gary Alexander[12]

[referred to as the "Alexander Affidavit"] at ¶¶  36-37).[13]  This statement is inconsistent with the

testimony given by Richter to the effect that Alexander advised him that Alexander was

"surprised" that Stecker did not know he suffered from Multiple Sclerosis at the time of

---

[11]   The defendant does not concede that the plaintiff was disabled within the meaning of the ADA , but for the purposes of the instant summary judgment motion, the defendant argues that the plaintiff cannot establish a *prima facie* case due to an inability to demonstrate that his termination was related to his disability.  (Docket No. 27 at page 4).

[12]   The Affidavit is dated September 15, 2003.  It appears that this is a typographical error and that the Affidavit was executed on September 15, 2005, the date on which it was filed with the Court.

[13]   This sworn statement by Alexander appears to leave little room for equivocation as to whether Alexander expressly advised Stecker that he had MS. However later in the affidavit Alexander alternatively suggests that  "even if Stecker did not know that I had MS, which he most certainly did, he still knew I had incurable medical problems that physically impaired me." (Alexander Affidavit at ¶ 38).

Alexander's termination.  More significantly, this self-serving and unsubstantiated statement in

plaintiff's affidavit opposing summary judgment is inconsistent with the plaintiff's own

deposition testimony.  At his deposition, Alexander recounted the discussion that took place

between himself, Stecker and Hartsell at the time of his firing.  In this regard, Alexander

testified:

> I told him that – that– I told him that, you know, "You
> know I have MS, and that could certainly affect my job
> performance, especially with the duties I have." at which time Earl
> [Stecker] said, "I didn't know you had MS."  And I said, "Did you
> know, Larry?"   And Larry said, "No, I didn't know you had MS. "
> And I said, "Well, I've – I've – I've got it."
>
> And I believe I said, "Ill be right back, " and I excused
> myself from my office and brought back a letter from the
> Cleveland Clinic and my neurologist, Dr. Stone, which indicated,
> you know, that the condition I had was a chronic one that was
> aggravated by stress and heat, which both were in abundance in the
> paper mill.

 (Docket No. 30, Exhibit A [referred to as "Alexander Dep."] at pages 185-186).

Alexander's deposition testimony regarding his discussion with Stecker at the time of his

termination contradicts Alexander's new contention that he had multiple discussions with

Stecker regarding his disability prior to that time.   The plaintiff cannot defeat a motion for

summary judgment with newly asserted allegations that are contradicted by his deposition

testimony. Brown v. Henderson, 257 F.3d 246, 252 (2d Cir.2001) ("[F]actual allegations that

might otherwise defeat a motion for summary judgment will not be permitted to do so when they

are made for the first time in the plaintiff's affidavit opposing summary judgment and that

affidavit contradicts [the plaintiff's] own prior deposition testimony."); see also Rubens v.

Mason, 387 F.3d 183, 192 (2d. Cir. 2004); Augustine v. Hee, 2005 WL 3528886, at *1 (2d. Cir. 2005).

Further, although the plaintiff asserts that others at CMG were aware of his condition, the plaintiff has presented no evidence whatsoever that Stecker had any communications with these individuals regarding the plaintiff's condition.  In addition, the plaintiff has presented no evidence whatsoever that his illness played any part in Stecker's determination to terminate him from Buffalo Paperboard other than his own conclusory and unsubstantiated allegations. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985) ("To allow a party to defeat a motion for summary judgment by offering purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all Title VII cases."); Ghosh v. New York City Dept. of Health,  2006 WL 297250, *12 (S.D.N.Y.,2006).

Similarly, Alexander fails to articulate evidence that he was denied that position at the Tama facility due to his disability.  The plaintiff points to the testimony of Richter to support his claim that Lowe interceded to preclude Richter from hiring Alexander based upon his disability. However, Richter's testimony contradicts the plaintiff's assertion that his disability played any role in his failure to be offered that position. The plaintiff has presented no evidence, other than his own conjecture and speculation, that his disability played a role in the decision not to offer the supervisor's position at Tama to him.

Thus, the plaintiff has not established a prima facie case that he is entitled to relief under the ADA in this case.[14]  In any event, even if it was determined that the plaintiff could establish a

---

[14]  The plaintiff must do more than suggest in conclusory fashion that evidence in admissible form exists to support his claims, he must demonstrate that it exists in the record.

*prima facie* case, or that a question of fact existed as to whether Stecker was aware of his medical condition, the defendant has established a legitimate, non-discriminatory bases for the decisions at issue.

The record reflects a compelling legitimate, non-discriminatory basis to support Alexander's termination from Buffalo Paperboard.  As discussed above, the defendant has presented evidence from several witnesses, including sworn statements from former-employees who worked with Alexander at Buffalo Paperboard, of several serious deficiencies in the plaintiff's performance while at that CMG facility, including: the failure to attend to his responsibilities; ignoring safety issues; failure to follow procedures in making purchases resulting in the incurrence of additional costs; failing to properly communicate specifications resulting in the purchase of $60,000 to $70,000 in spools that did not fit the company's machines; failure to fix broken machinery; refusal to share information with co-workers and superiors; as well as an inability to communicate well with co-workers. (See citations to the Stecker Affidavit, the Stecker Dep., the Reagan Affidavit, and the LaRuffa Affidavit discussed above).   The uncontroverted evidence in the record regarding the plaintiff's performance while at Buffalo Paperboard provides a legitimate, non-discriminatory basis for his termination from that position.

The plaintiff's papers in response to the instant motion do not dispute these specific allegations regarding his performance at Buffalo Paperboard, but instead assert that his poor performance was the result of the fact that he was overburdened with responsibilities, in part, because he was originally told the Buffalo facility was going to be closed, but then told that the facility would try to find a new niche to remain open.  It should be noted that the plaintiff admits

24

that he voluntarily took on the additional duties of the production manager's role inasmuch as it did not appear that the plant would be open for very much longer.  (Alexander Dep. at page 172). In any event, while the indecision regarding the viability of the plant and the under-staffing may have an impact on why Alexander performed poorly in certain respects at Buffalo Paperboard and why the production efficiency of the facility declined while Alexander was there, they do not dispute the poor performance or provide any evidence that his termination from Buffalo Paperboard was motivated by his medical condition.  The plaintiff argues that he was "set up" to be fired –  that the elimination of his position at Rittman, his being offered the position in Buffalo[15], the indecision regarding whether the Buffalo plant would remain open or be closed which resulted in his being overburdened by taking on the duties of the production manager, were all part of the effort to eliminate him from employment because of his illness so that CMG could save money on medical insurance bills.  (Docket No. 30-2 at pages 27-31).   However, the plaintiff has presented only his own unsubstantiated allegations in support of these propositions. The plaintiff presents no evidence whatsoever that the decision makers involved in this case were aware of the medical costs associated with his employment. Indeed, the only evidence in the record suggests that the managers did *not* have access to Alexander's medical file. (Cran Dep. at page 31).   Alexander has presented no evidence that CMG's  indecision regarding whether to keep the Buffalo facility open or to close it was in any way determined by or related to the fact of his employment at CMG.  Alexander does not, and apparently cannot, connect his agreement to

---

[15]    The plaintiff does not deny that he was treated preferentially to others whose jobs were eliminated due to the reduction in force at Rittman inasmuch as he was offered a new position when others were not.  Alexander does not address the argument that this fact is counter to his theory that CMG was seeking to terminate his employment because of his disability.

take on the additional duties of the vacant production manager's position to his medical condition.  The plaintiff has not alleged that he specifically requested help or accommodation because of his disability, but was denied such assistance or accommodation.  In short, the plaintiff has not, and apparently cannot, refute or raise a quest of fact as to the numerous serious documented deficiencies in his performance at Buffalo Paperboard which serve as the legitimate, non-discriminatory bases for his termination.  Instead, the plaintiff's reasserts the unsubstantiated theory of the case which necessitates a conspiracy between Stecker, Lowe and others at CMG to terminate the plaintiff's employment based upon his disability.  According to the plaintiff's argument, CMG's decision to remove him from his position at Rittman and offer him the position in Buffalo; CMG's indecision on the question of whether to close the Buffalo facility which resulted in Stecker's ability to undermine the plaintiff by getting him to agree to take on additional responsibilities which Alexander would perform poorly were all part of CMG's effort to eliminate Alexander from employment with CMG due to his disability.  Once again, the plaintiff has presented only his own self-serving conjecture in this regard.  Alexander suggests that evidence of pretext exists because some managers at CMG were aware of his illness, or that Hartsell was present to participate in his termination.[16]  The plaintiff's allegations fail to raise a triable issue of fact.

The plaintiff cites to Strate v. Midwest Bankcentre, Inc., 398 F.3d. 1011 (8th Cir. 2005) for the proposition that "the standard for plaintiff to survive summary judgment require[s] only that plaintiff adduce enough admissible evidence to raise genuine doubt as to the legitimacy of

---

[16]   Cran testified that it would not be unusual for a human resources manager to travel to a facility to participate in a termination. (Cran Dep. at page 64-69).

the defendant's motive, even if that evidence did not directly contradict or disprove the defendant's articulated reasons for its actions." (Docket No. 30-1 at page 24). Admissible evidence of the conclusory allegations asserted by the plaintiff is not in the record. The plaintiff suggests that the management at CMG knew he was MS, and that this knowledge is evidence of pretext. To the contrary, "[m]ere knowledge of a disability cannot be sufficient to show pretext." Christopher v. Adam's Mark Hotels, 137 F.3d 1069, 1073 (8th Cir.), *cert. denied,* 525 U.S. 821 (1998); Valentine v. Standard & Poor's, 50 F.Supp.2d 262, 285 (S.D.N.Y.,1999). The plaintiff's response to the instant motion does not meet his burden to raise an issue of fact as to whether the proffered basis for his termination from Buffalo Paperboard was pretextual and that his disability was a motivating factor with respect to that determination.

Similarly, the plaintiff has failed to rebut the proffered legitimate, nondiscriminatory basis for the determination not to offer him the supervisor position at Tama. As discussed above, Richter, who ultimately made the hiring determination for the position at the Tama facility, articulates a legitimate basis for selecting Smolcich over Alexander for the position. Richter sets forth the desired qualifications for the position. Richter further testified that Smolcich, and not Alexander, possessed these qualifications and was the best candidate for the position based upon what they wanted to achieve with respect to the hiring. In response, the plaintiff does not dispute Richter's testimony in his regard, but offers only conclusory allegations that his disability was a motivating factor. [17]

---

[17] Even if Alexander's claim relating to the elimination of his position at Rittman was not time barred, it would also fail for the similar reasons. At best, the plaintiff has raised a question of fact as to whether Lowe was aware that Alexander suffered from Multiple Sclerosis while he worked at Rittman. A question of fact may also exist as to whether or not Alexander's removal as production

In sum, the plaintiff has failed to meet his burden to articulate a question of fact with respect to his claims that he was discriminated against in violation of the ADA or the HRL, or retaliated against for any protected activity.

**Retaliation Claim**

The plaintiff also asserts a claim of retaliation under Title VII. "To establish a prima facie case of retaliation, an employee must show (1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff; and (3) a causal connection between the protected activity and the adverse employment action." Wimmer v. Suffolk County Police Dep't, 176 F.3d 125, 134 (2d Cir.1999)(quoting Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir.1998) (internal quotation marks omitted).

In the complaint, Alexander asserts that his job at Rittman was eliminated in retaliation for his objecting to "targeting employees with medical conditions." (Docket No. 1 at ¶ 34). The

---

manager constituted an adverse employment action even though Alexander was never terminated from the payroll, and did not experience a decrease in salary or benefits. However, because the plaintiff has not raised a question of fact as to whether his illness played a role in the elimination of that position, these factual issues are not material with respect to the instant motion. Even assuming affirmative answers with respect to the prior factual issues, the plaintiff has presented no evidence that Lowe's decision to eliminate the production manager's position was in any way related to the plaintiff's illness. Alexander acknowledges that the position of production manager was not refilled. (Alexander Dep. at page 83). Further, the plaintiff has not presented evidence to dispute the fact that there was a significant restructuring and reduction in force at Rittman; that Lowe was not happy with Alexander's performance at Rittman, and that the elimination of Alexander's production manager's position was part of the restructuring and reduction in force. The plaintiff has failed to raise a question of fact from which the trier of fact could conclude that the proffered legitimate non-discriminatory basis was a pretext and that the elimination of Alexander's position was motivated by the fact of the plaintiff's disability.

defendant asserts that the plaintiff has failed to establish a *prima facie* case of retaliation. (Docket No. 27 at page 24). Once again, the plaintiff does not address this argument in its responding papers, and thus, concedes this claim.  The court notes that the plaintiff has failed  to develop any basis in the record to conclude that the risk assessment process employed by CMG improperly "targeted" employees based upon medical conditions.  Further, even if the claim was not conceded by the plaintiff, the defendant has come forward with a legitimate, non-discriminatory basis for the elimination of his position at Rittman.  The plaintiff has failed to meet his burden to raise a question of fact that this action was a pretext for retaliation against him for voicing his opinion regarding the actions of the safety committee.

**Motion to Strike**

The defendant also moves to strike the Affidavit of plaintiff's counsel (Docket No. 30) submitted in opposition to the motion for summary judgment.  The Court notes that counsel's affidavit includes argument, and not a recitation of the facts.  To the extent counsel's affidavit purports to recite facts, counsel fails to include any citation to evidence in the record which would support the assertion of the proffered fact.  In this regard, counsel's affidavit was of limited utility.   Inasmuch as the Court did not rely upon any factual allegations set forth in counsel's affidavit in determining the motion for summary judgment, the motion is moot.

**Conclusion**

Based on the above, it is recommended that the defendant's motion for Summary Judgment be granted and that the complaint be dismissed in its entirety.

Pursuant to 28 USC §636(b)(1), it is hereby ordered that this Report & Recommendation be filed with the Clerk of the Court and that the Clerk shall send a copy of the Report & Recommendation to all parties.

**ANY OBJECTIONS to this Report & Recommendation must be filed with the Clerk of this Court within ten(10) days after receipt of a copy of this Report & Recommendation in accordance with 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, as well as WDNY Local Rule 72(a)(3).**

**FAILURE TO FILE OBJECTIONS TO THIS REPORT & RECOMMENDATION WITHIN THE SPECIFIED TIME,  OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WAIVES THE RIGHT TO APPEAL ANY SUBSEQUENT ORDER BY THE DISTRICT COURT ADOPTING THE RECOMMENDATIONS CONTAINED HEREIN.**  Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed2d 435 (1985); F.D.I.C. v. Hillcrest Associates, 66 F.3d 566 (2d. Cir. 1995); Wesolak v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988); see also 28 U.S.C. §636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and WDNY Local Rule 72(a)(3).

Please also note that the District Court, on *de novo* review, will ordinarily refuse to consider arguments, case law and/or evidentiary material which could have been, but was not,

presented to the Magistrate Judge in the first instance.  See <u>Patterson-Leitch Co. Inc. v.</u>

<u>Massachusetts Municipal Wholesale Electric Co.</u>, 840 F.2d 985 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to WDNY Local Rule 72.3(a)(3), "written

objections shall specifically identify the portions of the proposed findings and recommendations

to which objection is made and the basis for such objection and shall be supported by legal

authority."  **Failure to comply with the provisions of Rule 72.3(a)(3) may result in the District**

**Court's refusal to consider the objection.**

So Ordered.


_____/s/  Hugh B. Scott_____

United States Magistrate Judge
Western District of New York

Buffalo, New York
March 27, 2006

31